**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MERCEDES HAMADI,

        Plaintiff,

      v.                                         Civ. No. 20-220 SCY

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,[1]

        Defendant.

**MEMORANDUM OPINION AND ORDER**[2]

      Claimant Mercedes Hamadi argues that the Administrative Law Judge ("ALJ") who

denied her claim for disability insurance benefits under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 401-434, committed several instances of error. Ms. Hamadi argues that the

ALJ failed to explain why he rejected agency doctor limitations regarding asthma; that the ALJ's

discussions of the evidence regarding her asthma and headaches were insufficient; that the ALJ

erred in analyzing the subjective symptom evidence related to her fibromyalgia; that the ALJ

erred in finding that Ms. Hamadi had no medically determinable mental impairments; and that

the ALJ erred in finding that Ms. Hamadi can perform her past relevant work or other work of

significant numbers in the national economy. The Court disagrees with all of these contentions

and finds the ALJ decision is supported by substantial evidence. As a result, the Court DENIES

---

[1] Kilolo Kijakazi was appointed the acting Commissioner of the Social Security Administration
on July 9, 2021, and is automatically substituted as a party pursuant to Federal Rule of Civil
Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all
proceedings and to enter an order of judgment. Docs. 5, 7, 8. The Court has jurisdiction to review
the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).

Ms. Hamadi's Motion To Reverse And Remand For Rehearing, With Supporting Memorandum, Doc. 28, and affirms the decision below.[3]

## **APPLICABLE LAW**

A.      Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also id.* § 1382c(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)      At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)      At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)      At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

[3] The Court reserves discussion of the background, procedural history, and medical records relevant to this appeal for its analysis.

[4] "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). The claimant's "[w]ork may be substantial even if it is done on a part-time basis or if [she] doe[es] less, get[s] paid less, or ha[s] less responsibility than when [she] worked before." *Id.* "Gainful work activity is work activity that [the claimant] do[es] for pay or profit." *Id.* §§ 404.1572(b), 416.972(b).

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [the claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of the claimant's past work. Third, the ALJ determines whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4)

(supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731

(10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this

analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner

at step five to show that the claimant is capable of performing work in the national economy. *Id.*

A finding that the claimant is disabled or not disabled at any point in the five-step review is

conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799,

801 (10th Cir. 1991).

B.      Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless

(1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the

proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). "Substantial evidence . . . is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Therefore, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence" and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (internal quotation marks omitted). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court

"should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

## ANALYSIS

Ms. Hamadi argues that the Court should remand because: (1) the ALJ erred by failing to explain why he rejected agency doctor limitations regarding asthma, Doc. 28 at 6-10; (2) the ALJ's citations to the evidence regarding her asthma were misleading and incomplete, *id.* at 10-13; (3) the ALJ erred by failing to analyze the effects of her headache symptoms, *id.* at 13-18; (4) the ALJ erred in analyzing the subjective symptom evidence related to her fibromyalgia, *id.* at 18-22; (5) the ALJ erred in finding that Ms. Hamadi had no medically determinable mental impairments, *id.* at 22-23; and (6) the ALJ failed to make specific findings regarding Ms. Hamadi's ability to meet the demands of her past relevant work and the ALJ erred at step five by incorporating the earlier alleged errors from the RFC into his questions to the Vocational Expert ("VE"), *id.* at 23-26.

The Court rejects these contentions and affirms the decision below.

**I.     The ALJ Adopted the Agency Doctors' Limitations Related to Asthma And Imposed More Favorable Restrictions.**

The State agency medical consultants at the initial and reconsideration levels opined that Ms. Hamadi should "[a]void concentrated exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc." AR 70, 103. The ALJ gave "great weight" to the agency doctors' opinions. AR 21. The ALJ stated that he "adopted th[e opinions] as the residual functional capacity assessment, save that I have included additional environmental limitations." *Id.* In the RFC, the ALJ limited Ms. Hamadi to "occasional exposure to . . . dust/odors/fumes/pulmonary irritants." AR 19.

Ms. Hamadi argues this is reversible error because the agency consultants stated Ms. Hamadi must "avoid" exposure and the RFC permits "occasional" exposure. Doc. 28 at 6-7. She argues that if the ALJ rejects part of a medical opinion, he must explain why. *Id.* at 6 (citing *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)). The Commissioner, for her part, argues that "avoid concentrated exposure" does not mean "avoid all exposure"—it means the claimant can experience "more than moderate exposure and less than unlimited exposure." Doc. 32 at 12.

The Court agrees with the Commissioner. As a matter of common sense and the ordinary meaning of the terms, the ALJ did not reject the state agency consultants' opinions. There is nothing contradictory in saying Ms. Hamadi may have "occasional" exposure to pulmonary irritants and in stipulating that she must avoid "concentrated" exposure. The RFC does not say Ms. Hamadi can perform jobs with "concentrated" exposure to irritants. The ordinary meaning of concentrated exposure indicates something that is beyond occasional exposure.

In addition, the Court finds, with reference to the form the agency doctors use, that "avoiding concentrated exposure" is a technical term used by the Social Security Administration with a meaning equivalent to "permitting occasional exposure." The pertinent agency form asks the agency doctors to fill out the following chart:

F. ENVIRONMENTAL LIMITATIONS
☐ None established. (Proceed to section II.)

| | UNLIMITED | AVOID CONCENTRATED EXPOSURE | AVOID EVEN MODERATE EXPOSURE | AVOID ALL EXPOSURE |
|---|---|---|---|---|
| 1. Extreme cold | ☐ | ☐ | ☐ | ☐ |
| 2. Extreme heat | ☐ | ☐ | ☐ | ☐ |
| 3. Wetness | ☐ | ☐ | ☐ | ☐ |
| 4. Humidity | ☐ | ☐ | ☐ | ☐ |
| 5. Noise | ☐ | ☐ | ☐ | ☐ |
| 6. Vibration | ☐ | ☐ | ☐ | ☐ |
| 7. Fumes, odors, dusts, gases, poor ventilation, etc. | ☐ | ☐ | ☐ | ☐ |

Form SSA-4734-BK at page 5, https://secure.ssa.gov/apps10/poms/images/SSA4/G-SSA-4734-BK-1.pdf.

The Commissioner argues, and the Court agrees, that these boxes demonstrate that "avoid concentrated exposure" falls somewhere in between "no restriction" and "moderate restrictions." The phrase "occasional" in an RFC falls in between no ability to do the activity and an ability to perform the task "frequently." "Occasional" means "occurring from very little up to one-third of the time," whereas "frequent" means "occurring from one-third to two-thirds of the time." Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6. In other words, the boxes from the chart roughly correspond to the following restrictions in an RFC:

| Unlimited exposure | Avoid concentrated exposure | Avoid moderate exposure | Avoid all exposure |
|---|---|---|---|
| No restriction on performing the task | Can perform the task frequently | Can perform the task occasionally | Cannot perform the task |

Therefore, as the Commissioner argues, the ALJ's RFC using the word "occasional" is *more* restrictive than the agency's doctors' opinions using "avoid concentrated exposure," not less. *See Young v. Berryhill*, No. 16cv112, 2017 WL 6352756, at *6 (N.D.W. Va. Dec. 13, 2017) ("concentrated exposure means more than occasional exposure"); *Bernier v. Saul*, No. 18cv1633, 2019 WL 5296846, at *7-8 (D. Conn. Oct. 18, 2019) ("avoid concentrated exposure" is the "least restrictive limitation," unlike "occasional" exposure, and an RFC to "avoid concentrated exposure" is compatible with performing jobs that require "frequent" environmental exposure).

Ms. Hamadi's argument requires the Court to read the adjective "concentrated" out of the agency doctors' opinions. It is true that the RFC is incompatible with a finding that Ms. Hamadi must avoid all exposure to pulmonary irritants. In fact, Ms. Hamadi's counsel dropped the adjective "concentrated" when questioning the VE at the hearing. AR 56. Instead, counsel changed the hypothetical from "occasional pulmonary irritants, in terms of exposure," to

"never." But whether Ms. Hamadi would qualify for benefits if she could "never" be exposed to pulmonary irritants is irrelevant because no medical testimony supports a finding that Ms. Hamadi is impaired to the extent that she can "never" be exposed to pulmonary irritants. Accordingly, the ALJ committed no error in refusing to incorporate this limitation into the RFC.

In reply, Ms. Hamadi argues that the Commissioner's explanation is a post hoc justification because the ALJ did not explain his reasoning that "occasional exposure" is more restrictive than "avoiding concentrated exposure." Doc. 33 at 4.  The Court finds that the ALJ does not have to explain that he is using terms as they are normally used, either with respect to their plain meaning or in the arena of specialized social security terms. *See Black v. Berryhill*, No. 17cv153, 2018 WL 1472525, at *11-12 (D. Utah Mar. 7, 2018), *report and recommendation adopted*, 2018 WL 1468573 (D. Utah Mar. 23, 2018) (ALJ does not have to explain terms of art that are defined by SSA regulations or policies).

Because the ALJ did not err in fashioning the RFC, the Court also rejects Ms. Hamadi's argument that the ALJ was required to formulate a different question for the vocational witness at step five. Doc. 28 at 25-26; Doc. 33 at 5. No inconsistency exists between the vocational expert's testimony and the RFC.

**II.    The ALJ Did Not Err In Evaluating The Record Evidence Of Asthma.**

With respect to her severe impairment of asthma, Ms. Hamadi argues that the ALJ's "citations to the evidence were misleading and incomplete"; that the ALJ erred "by offering only one citation" for his conclusions; and that "the ALJ did not explain why findings of moderate asthma do not support Ms. Hamadi's claims of limitations due to difficulty breathing"; that "the citation[s] to the evidence that the ALJ did provide were misleading"; and that the ALJ overlooked "evidence from clinic visits related to asthma exacerbations." Doc. 28 at 10-12.

Plaintiff cites no authority requiring the ALJ to cite a certain amount or proportion of evidence in the record. The Tenth Circuit has held that "[t]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). In addition, the ALJ should not ignore relevant evidence or mischaracterize the evidence. *Id.* at 1010 ("Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."); *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (ALJ erred by "ignor[ing] evidence from [a clinical nurse specialist] that would support a finding of disability while highlighting evidence favorable to the finding of nondisability"); *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987) (reversing where, among other things, ALJ erred by mischaracterizing the evaluation of a treating physician). Because the burden is on the claimant to point to probative evidence the ALJ ignored, *Mays v. Colvin*, 739 F.3d 569, 575-76 (10th Cir. 2014), the Court will only discuss the evidence Ms. Hamadi specifically cites in her brief.

The ALJ's discussion of Ms. Hamadi's asthma is brief:

> Turning to the claimant's respiratory impairments, there have been some instances of severe exacerbations. (E.g., Ex. 2F/17.) Outside of this, however, respiratory signs have been no more than intermittently abnormal, and her asthma has generally been characterized as mild to moderate. (E.g., Exs. 2F/5, 12, 68; 5F/24; 6F/6; 10F/3, 10, 49.) October 2013 pulmonary function testing (PFT) showed a forced vital capacity (FVC) of 2.58 L, or 77% of predicted value; and a forced expiratory volume after one minute (FEV1) of 2.16 L, or 79% of predicted value. These results were interpreted to indicate a mild restrictive process. (Ex. 2F/146.)

AR 21. Ms. Hamadi argues that this discussion downplays the severity of the "instances of severe exacerbations" and overstates the significance of the "mild to moderate" characterizations of her impairment by physicians. Doc. 28 at 7-13.

At the outset, the Court notes that there is no opinion evidence about Ms. Hamadi's asthma from a treating or examining physician. The only medical opinions in the record pertaining to Ms. Hamadi's pulmonary limitations are from the two state agency consultants on initial review and reconsideration. The ALJ gave "great weight" to those opinions and imposed *more* restrictive pulmonary limitations. AR 21; *supra* pp. 5-8. Thus, Ms. Hamadi makes the difficult argument that, even though the ALJ imposed a restriction greater than any doctor on the record suggested, the ALJ erred in not formulating an even more restrictive RFC. This argument, and the sub-arguments Ms. Hamadi makes in support of it, all fail.

First, the ALJ did not error in citing only one instance of "severe exacerbations." In this instance, the ALJ cited Exhibit 2F/17, or AR 362, the record of an ER visit on August 29, 2016. Ms. Hamadi presented with respiratory distress, decreased breath sounds, and wheezing. AR 361-62. Although she improved with medication, she still had persistent wheezing after medication and so was admitted to the hospital. AR 362. She was diagnosed with acute respiratory failure with hypoxia, secondary to a severe asthma exacerbation, and "mild persistent asthma." AR 368. On her second day, she still had persistent chest and back pain. AR 372. She also reported improved breathing but lower extremity weakness. AR 374. The third day, she continued to report lower extremity pain and weakness although she had been able to walk to and from the bathroom and to the waiting area. AR 376. The etiology of her symptoms was unclear but was thought to be either from acute respiratory failure, fibromyalgia, or a somatic symptom. AR 377. The physical therapist found her effort to be poor and inconsistent; he did not know what was causing the symptoms. AR 379-80. Ms. Hamadi was discharged September 2, with orders for home physical therapy and a five-day course of prednisone. AR 381-85. The parties do

not dispute that the ALJ correctly cited this episode as an example of a "severe exacerbation" of her asthma.

But Ms. Hamadi argues that the ALJ also should have cited the following instances of severe exacerbations:

- April 4, 2015: Presented to the ER with difficulty breathing, abdominal pain, and a cough. AR 423. She had "slightly decreased" breath sounds. AR 424. The chest radiographic study was unremarkable. AR 425. She was feeling "much better" later that day and could breathe easily. AR 426. She was discharged in stable condition. *Id.*

- June 27, 2015: Presented to the ER with respiratory pain, shortness of breath, and headache. AR 415-16. She had left sided rales and was noted to be in mild respiratory distress. AR 417. A few hours later, she was resting with no signs of acute distress and even, non-labored breathing. AR 417-18. She was discharged and agreed to take Tylenol at home. AR 418.

- November 3, 2015: Presented to the ER with shortness of breath, with no relief from her nebulizer. AR 324. She was noted to be in mild overall distress, with moderate expiratory wheeze and no signs of overt respiratory distress. AR 325. She was diagnosed with acute asthma exacerbation and was discharged when significantly improved on reexamination. AR 325.

- February 27, 2016: Presented to the ER with difficulty breathing, not helped by using inhalers. AR 326. She had shortness of breath and coughing, with equal breath sounds and a few scattered wheezes bilaterally. AR 326-27. She received nebulizer treatment, steroids for asthma, and Toradol for pain. AR 328. She was discharged after a couple hours when her condition stabilized. *Id.*

- August 27, 2017: Presented to the ER with shortness of breath and a cough, with no relief from medications. AR 901. She had no respiratory distress, but with diffuse wheezes and a prolonged expiratory phase, and was speaking only in 3-4 word sentences. AR 903. After steroids, she was feeling better and wished to go home. AR 904, 906.

Doc. 28 at 8-10.[5]

---

[5] Ms. Hamadi also argues that one of the pieces of evidence the ALJ should have cited is a 2017 self-report on an agency form that she is able to do less because of more severe asthma. Doc. 28 at 10 (citing AR 291). This relates to the ALJ's evaluation of subjective symptom evidence, and not Ms. Hamadi's contention that the ALJ mischaracterized the medical evidence.

After considering the record evidence, the Court does not agree that the ALJ committed reversible error by not citing each of these instances. The ALJ did not mischaracterize the evidence when stating that Ms. Hamadi suffered "some instances of severe exacerbations" of her respiratory impairments. These five instances over a three-year period are not wildly out of proportion with the ALJ's use of the word "some," rather than "many," instances of exacerbations. Ms. Hamadi offers no authority for the proposition that the ALJ must cite all examples of something appearing in the medical record.

Second, the ALJ did not err when contrasting the instances of exacerbations with the evidence demonstrating that her "respiratory signs have been no more than intermittently abnormal, and her asthma has generally been characterized as mild to moderate." AR 21. Ms. Hamadi argues that the ALJ's citations to the evidence for this proposition are "misleading." Doc. 28 at 10. The Court disagrees:

- September 12, 2013: Presented to Cynthia Kirschenman for evaluation of asthma. AR 489. Pulmonary function testing revealed "a mild restrictive process." AR 491 (cited by ALJ as Exhibit 2F/146). Ms. Hamadi criticizes the ALJ for citing this evidence from 2013, outside the period she is eligible for benefits, but does not explain how the change—or lack of change—in her condition from 2013 to 2017 is error for the ALJ to consider.

- July 6, 2015: Presented to Dr. Jordan for follow up from the June 2015 hospitalization. She "feels good" with "no issues today." AR 411. Her chest exam was normal. AR 412. The diagnosis was "asthma, moderate persistent, with acute exacerbation" and "uncontrolled." AR 413 (cited by ALJ as Exhibit 2F/68). Ms. Hamadi emphasizes the word "uncontrolled," Doc. 28 at 11, but the physician characterized the asthma as "moderate" with some acute exacerbations, which mirrors the ALJ's description. Dr. Jordan viewed the asthma as uncontrolled given the exacerbations, and referred her to pulmonology. AR 413.

- September 21, 2016: Presented to PA Bish with chest tightness, cough, difficulty breathing, and frequent throat clearing and wheezing. AR 355. She did not have shortness of breath. *Id.* This was noted to be a "recurrent" problem with a hospitalization on August 29 through September 2. *Id.* The assessment was "asthma, mild persistent, with status asthmaticus." AR 357 (cited by ALJ as Exhibit 2F/12). Ms. Hamadi argues that "status asthmaticus" describes a patient "where physical exhaustion from the overwhelming work of breathing leads to respiratory arrest and

death from hypoxia or related complications." Doc. 28 at 11. However, the physician described her condition as "stable" and anticipated to improve with medication. AR 357. There is no support in the treatment note for the risk of a respiratory attack leading to death. The treatment note clearly states her asthma is "mild" but subject to an acute attack which could require hospitalization, such as the episode on August 29—which squares exactly with the ALJ's discussion.

- November 11, 2016: Presented to Dr. Jordan for an asthma attack without any cause. AR 349. The chest exam showed normal respiratory effort, clear to auscultation with no wheezes, crackles, or rales, non-tender to palpation of chest wall. AR 350 (cited by ALJ as Exhibit 2F/5). Ms. Hamadi argues she was not claiming asthma symptoms during the visit, but that has no bearing on the physician's diagnosis of "asthma in adult, mild intermittent, uncomplicated," AR 353, which clearly matches the ALJ's description.

- March 7, 2017: Presented to ER with headache, weakness, and nausea after a fall. AR 839. Physical examination of the pulmonary/chest area reflected normal effort and breath sounds and no respiratory distress. AR 841 (cited by ALJ as Exhibit 5F/24). Ms. Hamadi complains the purpose of the visit was unrelated to her asthma, Doc. 28 at 11, but does not cite any authority showing the ALJ's reliance on this medical note is error.[6]

- April 23, 2017: Presented to ER with chest pain, nausea, vomiting, and shortness of breath. AR 862. Physical examination was negative for cough and shortness of breath, AR 864, and the pulmonary/chest area reflected normal effort and breath sounds, AR 865 (cited by ALJ as Exhibit 6F/6). Again, Ms. Hamadi's complaint is that the purpose of the visit was not to treat asthma. As set forth above, however, the relevance of a medical finding is not undermined by an unrelated impetus for the medical visit.

- August 24, 2017: Presented to PA Ratliff with coughing, congestion, shortness of breath, and chest tightness. AR 942. A physical exam of the pulmonary/chest area revealed wheeze and rales. AR 943 (cited by ALJ as 10F/3). The provider's assessment was "acute upper respiratory infection" and "exacerbation of asthma." *Id.*

---

[6] The Court agrees with this analysis from the District of Kansas:

> The Court does not share Plaintiff's concern with regard to the ALJ's reliance on these examinations. Even though Plaintiff was not seeking treatment for her back pain, both doctors included information from her visits that is relevant to her back pain. . . . Plaintiff does not contend that either doctor was unqualified to make these medical findings. Nor does she cite any authority that the ALJ could not rely on medical evidence simply because the primary purpose of the doctor's visit was unrelated to her back pain.

*Karla Marie L. v. Saul*, No. 18cv2699, 2020 WL 1638060, at *7 (D. Kan. Apr. 2, 2020).

Ms. Hamadi was directed to continue with treatment at home and go to the ER if symptoms worsened. *Id.* The Court agrees with the Commissioner that this citation supports the ALJ's conclusion that Ms. Hamadi's respiratory symptoms are "intermittently abnormal." AR 20.

- October 4, 2017: Presented to PA Pospisal with abdominal pain. AR 949. A physical examination of the pulmonary/chest area reflected normal effort and breath sounds; no respiratory distress, wheezes, or rales. AR 950 (cited by ALJ as 10F/10). Ms. Hamadi again complains that the purpose of the visit was not to treat asthma and for the above-stated reasons, the Court again rejects this argument.

- September 12, 2018: Presented to PA Bish with coughing, chest pain, shortness of breath, and wheezing. AR 988. She presented with respiratory distress, wheezes, diminished breath sounds; taking a deep breath resulted in coughing. AR 989 (cited by ALJ as 10F/49). She breathed easier after treatment. *Id.* The Court agrees with the Commissioner that this citation supports the ALJ's conclusion that Ms. Hamadi's respiratory symptoms are "intermittently abnormal." AR 20.

Doc. 28 at 11-12. In addition, Ms. Hamadi contends the ALJ should have, but failed to, discuss

the following treatment records:

- November 5, 2015: Presented to PA Bish with chest tightness and shortness of breath. AR 407. Review of pulmonary/chest area found normal effort, normal breath sounds, no respiratory distress, and no wheezes. Breath sounds were normal. AR 409. She was diagnosed with moderate, persistent, uncomplicated asthma. *Id.* The Court does not agree this is an instance of a severe asthma exacerbation and finds instead that it supports the ALJ's conclusion that her asthma is "moderate" but "intermittently abnormal."

- September 4-7, 2016: Telephone encounters regarding self-reports of asthma symptoms. AR 358. RN Wilson recommended Ms. Hamadi go to ER. *Id.* The Court finds this is not probative medical evidence the ALJ was required to discuss.

- September 21, 2016: Presented to PA Bish with chest tightness, cough, difficulty breathing, and frequent throat clearing and wheezing. AR 355. The ALJ did discuss this encounter, AR 357 (cited by ALJ as Exhibit 2F/12), and the Court found the evidence supports the ALJ's characterization of it, *supra*.

- August 24, 2017: Presented to PA Ratliff with coughing, congestion, shortness of breath, and chest tightness. AR 942. The ALJ did discuss this encounter, AR 943 (cited by ALJ as 10F/3), and the Court found the evidence supports the ALJ's characterization of it, *supra*.

Doc. 28 at 12.

After this careful review of Ms. Hamadi's cited record evidence, the Court finds the ALJ did not commit any legal errors in weighing the evidence of asthma in the record. Finding no legal error in the ALJ's discussion, the Court considers whether substantial evidence supports the ALJ's conclusion. The ALJ concluded that the instances of severe exacerbations and intermittent abnormalities did not outweigh the evidence that her asthma has generally been characterized as mild to moderate. AR 20. The agency consultants' opinions and the record evidence of mild-to-moderate asthma symptoms over the course of three years constitute "more than a scintilla" of evidence and easily clear the substantial-evidence bar. The Court affirms the ALJ's treatment of Ms. Hamadi's asthma.

## III.   The ALJ Did Not Err In Discussing Headache Evidence.

Ms. Hamadi argues that the ALJ failed to assess the limitations or the effects of her headache symptoms. Doc. 28 at 3. Ms. Hamadi cites SSR 96-8P, which instructs that "[t]he RFC assessment must be based on all of the relevant evidence in the case record," 1996 WL 374184, at *5; and *Lauer v. Commissioner*, 752 F. App'x 665 (10th Cir. 2018), in which the ALJ failed to find that the claimant's headaches were a "severe" impairment and therefore failed to "analyze Ms. Lauer's complaint about near-daily migraine headaches at any step of his analysis." In addition, Ms. Hamadi cites *Deardorff v. Commissioner*, Doc. 28 at 18, which finds error where the ALJ did not analyze migraines as a severe impairment or assess her symptom evidence related to migraines. 762 F. App'x 484, 489-90 (10th Cir. 2019). Ms. Hamadi's citation to these authorities is misplaced.

This is not a case in which the ALJ committed clear legal error by altogether failing to assess relevant medical conditions as in *Lauer* and *Deardorff*. Instead, the ALJ found Ms. Hamadi's migraines to be a severe impairment at step two and analyzed them at length in step four. AR 17, 20-21. Because the ALJ indisputably considered Ms. Hamadi's headaches at steps

two and four, the Court rejects her argument that he committed legal error by failing to consider

them *enough* when fashioning the RFC. Doc. 33 at 1-2. Rather than being an argument that the

process the ALJ followed constituted legal error, Ms. Hamadi's argument bears on whether

substantial evidence supports the RFC—the question to which the Court now turns.

The ALJ stated:

Regarding the claimant's migraine disorder, I do note regular office visits for headaches. (E.g., Ex. 2F/3.) I have included appropriate environmental limitations in the above residual functional capacity assessment, to minimize or eliminate the risk of triggering headaches or exacerbating them when she does get them. However, I do not find sufficient documentation in the record to support an allowance for time off task or for absenteeism, and so have included none here. I do note that in February 2017, the claimant presented with stroke-like symptoms, which were attributed to her migraine disorder. However, a brain MRI and a brain CT were essentially unremarkable. Additionally, her reported memory deficits were, according to a treatment provider, "concerning for nonorganic etiology as she remembers events from this morning but does not recall her name." This raises a question as to what extent her reported symptoms are correctly attributed to her migraine disorder or any other medically determinable impairment. (Ex. 5F/3, 8-9, 15.) In terms of treatment modalities, in September 2018 the claimant began undergoing botulinum toxin injections. (Ex. 10F/55.)

AR 20.

Ms. Hamadi summarizes evidence that she complained of headaches and received

treatment for them "many times" starting in February 2014:

- Ms. Hamadi reported dizziness and a headache in February 2014. AR 481, 483.

- In July 2014, Ms. Hamadi sought care at the ER for a headache accompanied by nausea. AR 464.

- On September 13, 2014, Ms. Hamadi sought care at the ER for headache, visual disturbance, and neck pain. AR 449. The next day she was still positive for headaches. AR 434-36.

- On November 5, 2015, she reported that headaches are an associated symptom of her asthma attacks. AR 407. She reported on November 12 that another prescription medication was giving her "real bad headaches." *Id.*

- In February 2016, she reported a headache during an ER visit for asthma symptoms. AR 326.

- In March 17, 2016, Ms. Hamadi sought care at the ER for a headache with nausea and a swollen eye. AR 404. The CT scan showed no acute findings. AR 406. The ER provider diagnosed an acute migraine headache and prescribed sumatriptan. *Id.*

- On May 6, 2016, she reported that her headaches had been present for four months and were getting worse. AR 401. The CT scan revealed no acute abnormalities. AR 402. She was referred to neurology. AR 403.

- On May 27, 2016, a brain MRI showed some increased signal in the white matter, which was "not unusual" and consistent with aging. The scan was otherwise unremarkable. AR 571-72.

- In September 2016 her medication list included amitriptyline and metoprolol tartrate for "intractable chronic migraine." AR 805.

- In November 2016, Ms. Hamadi reported headaches to Dr. Jordan, relieved by taking iodine. AR 348-49.

- In November 2016, Ms. Hamadi reported headaches, dizziness, loss of energy, neck pain, joint pain, shortness of breath, nausea, and sleep problems. AR 808. Ms. Hamadi reported that her headaches were triggered by strong odors, are made worse by activity, and are relieved by rest and sleeping. AR 809.

- In February 2017, Ms. Hamadi presented at the ER with stroke-like symptoms of headache; left sided weakness, numbness, and tingling; nausea and vomiting; and confusion. AR 820.

- In March 2017, Ms. Hamadi presented at the ER reporting a headache that began after she became weak and fell, although she did not hit her head. AR 839. She told the ER provider that her headaches occur daily or every other day. *Id.*

Doc. 28 at 13-16.[7]

Although the ALJ summarized all of this evidence in only one sentence—"I do note

regular office visits for headaches"—the Court does not find that this sentence is so incorrect as

to render the opinion lacking in substantial evidence. "The record must demonstrate that the ALJ

---

[7] Ms. Hamadi also argues that the ALJ should have discussed a January 2017 self-report on agency forms that she has severe headaches occurring four days a week and that her headaches became much more severe and more frequent in the winter of 2016; and in June 2017 that her headaches were worse. Doc. 28 at 15-16 (citing AR 267, 269, 288). This relates to the ALJ's evaluation of subjective symptom evidence (addressed below), and not Ms. Hamadi's contention that the ALJ mischaracterized the medical evidence.

considered all of the evidence," but there is no requirement that the ALJ "discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The Court finds that the ALJ considered the evidence related to Ms. Hamadi's headaches. The ALJ acknowledged the worst of the episodes related to Ms. Hamadi's headaches—her February 2017 ER visit ER with stroke-like symptoms of headache. AR 20, 820. The ALJ weighed the "regular office visits" and the ER visit against the MRI and CT scans that were unremarkable. AR 825. In addition, the ALJ gave "great weight" to the opinions of the state agency consultants—again, the only medical opinions in this record—who found that environmental limitations would be supported by Ms. Hamadi's asthma, but gave no indication that environmental limitations were appropriate in connection with Ms. Hamadi's headaches. AR 70. The doctors also found that she is able to perform "light" work because although she does experience migraines and sought treatment for them, "[s]ome of the subjective allegations seem far more severe than the objective evidence." AR 66, 72-73. The Court does not reweigh this evidence. The ALJ's decision is supported by substantial evidence and does not mischaracterize the record.

Ms. Hamadi argues that the ALJ did not explain the basis for his fashioning of "appropriate environmental limitations" in the RFC designed "to minimize or eliminate the risk of triggering headaches or exacerbating them when she does get them." Doc. 28 at 16; AR 20. The Court agrees that these are unexplained and not obviously responsive to the medical evidence the ALJ evaluated. However, it is not error for an ALJ to include limitations *more* favorable to the claimant than what the evidence supports. *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012). Ms. Hamadi does not contend these limitations are unfavorable to her. She contends only that the ALJ should have fashioned more restrictive limitations. Doc. 28 at 16-17. But the ALJ explained

that "I do not find sufficient documentation in the record to support an allowance for time off task or for absenteeism," AR 20, and, as discussed above, substantial evidence supports this finding.

Ms. Hamadi then transitions to a challenge of the ALJ's evaluation of her subjective symptom evidence. Doc. 28 at 17; *see also* Doc. 33 at 8 (citing SSR 16-3p, which governs the evaluation of subjective symptom evidence). She complains that "[t]he ALJ failed to note that there were often no triggering events to Ms. Hamadi's headaches, but that she sometimes wakes up with them, or they come on suddenly with no obvious cause"; "[t]he ALJ also failed to note that the headaches are often accompanied by nausea and can last for several hours"; the ALJ failed to "evaluate the diagnoses of medical sources" because "Ms. Hamadi has been diagnosed with headaches numerous times"; and the ALJ failed to consider whether the symptoms have become worse over time and "Ms. Hamadi reported that her headaches became more severe and more frequent in the winter of 2016." Doc. 28 at 17.

The ALJs' assessments of subjective symptom complaints "warrant particular deference." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002). While the Tenth Circuit has "insisted on objectively reasonable explanation over mere intuition," it has "not reduced [subjective symptom] evaluations to formulaic expressions." *Id.* at 909. The courts do not "'require a formalistic factor-by-factor recitation of the evidence.'" *Id.* (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)). The ALJ need only "set[] forth the specific evidence he relies on in evaluating the claimant's" subjective symptom evidence. *Id.* "Findings as to [subjective symptom evidence] should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

Contrary to Ms. Hamadi's argument, the ALJ acknowledged her subjective complaints related to the symptoms of her headaches. He stated that "[s]he reports having to stay in bed at times," and that "when she did work, she was starting to miss work two days a month." AR 20. "She states she lies down once a day for less than an hour, except that when she has migraines she must lie down for longer. She also reports needing darkness when she has a migraine." AR 20. But the ALJ found that the objective medical evidence does not support "the claimant's allegations of debilitating symptoms." AR 21. In addition, the ALJ relied on Ms. Hamadi's activities of daily living:

> [T]he claimant cooks complete meals, though simpler ones than she used to. She sweeps, vacuums, does dishes, and does the laundry, albeit (per one function report, though not the other) allegedly with frequent breaks, more slowly, and with help from her husband. She drives. She shops in stores for groceries, etc. once a week for about an hour. She can handle money matters. She provides extensive care for her several children. (Exs. 5E; 8E; 10E; 11E; Hearing Testimony.) This degree of activity is not entirely consistent with the claimant's allegations.

AR 21.

The ALJ's discussion "properly grounded his credibility assessment" because he "based his judgment on his review of the medical records as well as [the claimant's] own account of her daily activities, finding both to be inconsistent with her complaints of disabling pain." *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001). The Court rejects Ms. Hamadi's argument that the ALJ was required to discuss her subjective symptom allegations in more detail. The ALJ demonstrated that he considered her allegations of debilitating symptoms that, if present, would render her unable to work. Ms. Hamadi argues that more detail is required, but the only authority she cites in support is SSR 16-3p. Doc. 28 at 17. SSR 16-3p provides a general framework for how the administration treats subjective symptom evidence but does not state, for example, that

"[t]he ALJ also must consider whether the symptoms have become worse over time" or that it is harmful error to fail to do so. *Cf.* Doc. 28 at 17.[8]

IV.   **The ALJ Properly Evaluated Ms. Hamadi's Fibromyalgia.**

SSR 12-2p "provides guidance on how [the administration] develop[s] evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM)." 2012 WL 3104869, at *1. "As with any claim for disability benefits, before we find that a person with FM is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." *Id.* at *2. This "objective evidence" can only come from a treating physician. *Id.* A diagnosis alone is not enough; the treating physician must document that she reviewed the person's medical history and conducted a medical exam. *Id.* With respect to subjective symptom evidence, SSR 12-2p explains that, once the presence of fibromyalgia is established, the claimant's subjective symptom evidence regarding that condition is evaluated just like any other subjective symptom evidence. *Id.* at *5.

At step two in this case, the ALJ found that Ms. Hamadi has a medically determinable impairment of fibromyalgia that is severe. AR 17. At step three, the ALJ found that her fibromyalgia did not singly or in combination meet or equal any listing. AR 18-19. At step four, the ALJ described Ms. Hamadi's subjective symptom evidence:

> [T]he claimant alleges disability due to: fibromyalgic symptoms, including pain at an average of 8/10 . . . . She reports lack of energy. As a result of her alleged symptoms, she alleges limitations in lifting, squatting, bending, standing, sitting,

---

[8] Ms. Hamadi does not provide a pinpoint citation to SSR 16-3p. The Court has nonetheless reviewed the ruling in full. The ruling explains that symptoms *can* worsen over time, and therefore "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate." SSR 16-3p, 2017 WL 5180304, at *9. But the ALJ here did not reject Ms. Hamadi's allegations for being internally inconsistent, so the reference to worsening symptoms in SSR 16-3p does not appear to be relevant to the case at bar.

walking, kneeling, stair climbing, completing tasks, and concentration. In particular, she states she can lift no more than 5 pounds, can sit no more than 30 minutes, can stand no more than 15 minutes, and can walk no more than 10 minutes, or about half a block to a block, before having to rest for 2 or 3 minutes. She reports having to stay in bed at times. . . . She states that when she did work, she was starting to miss work two days a month. She states she lies down once a day for less than an hour . . . .

AR 20. But the ALJ found that Ms. Hamadi is capable of performing a range of exertionally light work despite her impairments. AR 19. Regarding fibromyalgia specifically, the ALJ found:

Beginning with pertinent musculoskeletal and neurological signs, some tenderness and muscle spasms have been occasionally noted. However, the claimant has generally exhibited normal gait, normal coordination, and normal range of motion (ROM) (including back ROM). Reflexes, sensation, and motor strength have all been generally normal. Straight leg raising has been negative. (E.g., Exs. 1F/9; 2F/4, 17, 23, 57, 61, 69, 139, 178; 3F/6-7; 7F/5; 10F/10, 32.)

Also of note, treatment providers have noted inconsistencies between her reported symptoms and what they observed, as when she stated she was unable to walk but was observed to walk a number of times by treatment providers. Treatment providers also noted "very poor effort" on physical exam. (Ex. 2F/40.) A July 2018 lumbar MRI was normal to minimally abnormal in its results. (Ex. 10F/39.)

. . . .

[T]he claimant cooks complete meals, though simpler ones than she used to. She sweeps, vacuums, does dishes, and does the laundry, albeit (per one function report, though not the other) allegedly with frequent breaks, more slowly, and with help from her husband. She drives. She shops in stores for groceries, etc. once a week for about an hour. She can handle money matters. She provides extensive care for her several children. (Exs. 5E; 8E; 10E; 11E; Hearing Testimony.) This degree of activity is not entirely consistent with the claimant's allegations.

The opinions of the State medical consultants were given great weight. (Exs. 3A; 4A; 7A; 8A.) State medical consultants are non-treating, non-examining sources who, however, possess extensive program knowledge. In terms of consistency with the record, although there have been some findings of tenderness and muscle spasms, these are occasional findings, not the norm, and moreover there is a substantial body of pertinent normal findings, like normal ROM, gait, and strength. Lumbar imaging was no more than minimally abnormal. . . .  I find the consultants' opinions to be consistent with and supported by these considerations, which fairly characterize the evidentiary record, and have adopted them as the residual functional capacity assessment . . . .

AR 20.

Ms. Hamadi argues that she "has been diagnosed with fibromyalgia since 2012." Doc. 28 at 19. "She reported fatigue and myalgias to medical providers on multiple occasions from 2012 through 2017." *Id.* She was referred to rheumatology in February 2015 to assess joint and bone pain. *Id.* Her fatigue and muscle weakness led to evaluation for lymphoma in June 2016. *Id.* She has consistently reported and been treated for back pain, abdominal symptoms with nausea, tenderness and guarding, with muscle spasms on the right lower lumbar region, and headaches, all of which affect her ability to sustain employment. *Id.* at 19-20.

She complains that the ALJ "recognized Ms. Hamadi's diagnosis of fibromyalgia but failed to include any limitations relating to the pain and fatigue that it causes." *Id.* at 20. She argues that "[t]he ALJ's failure to assess the effects of these impairments on her functional ability was error" and "normal findings . . . can be consistent with reporting in fibromyalgia cases." *Id.* She argues that "[t]he ALJ erred by measuring Ms. Hamadi's ability by the lack of objective medical evidence," *id.* at 21 (citing *Moore v. Barnhart*, 114 F. App'x 983, 990-92 (10th Cir. 2004)), and erred by relying on her alleged "lack of effort" as well as her activities of daily living, *id.* at 21-22.

The Tenth Circuit has acknowledged the difficulty of analyzing fibromyalgia. *Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) ("Because proving the disease is difficult, fibromyalgia presents a conundrum for insurers and courts evaluating disability claims." (internal quotation marks and alterations omitted)). But as described above, the Social Security Administration has ruled that subjective symptom evidence with respect to fibromyalgia must be evaluated like any other subjective symptom evidence. SSR 12-2p, 2012 WL 3104869, at *5. Nor has a precedential decision by the Tenth Circuit adopted the rule urged by Ms.

Hamadi—that, due to the subjective nature of the disease, a claimant's subjective symptom evidence must be credited and objective medical evidence can play no role.

In *Newbold v. Colvin*, the Tenth Circuit affirmed an ALJ's decision to give "diminished weight" to a "fibromyalgia questionnaire" completed by a treating physician. 718 F.3d 1257, 1265-66 (10th Cir. 2013). The ALJ found the doctor's opinion to be inconsistent with the claimant's activities of daily living, which included "car[ing] for her own personal needs; do[ing] household chores, i.e., dishes, vacuuming; cooking; texting friends; using a computer; driving; grocery shopping; reading; watching television; visiting with friends; attending church on a weekly basis; and, attending church activities one night a week." *Id.* at 1266. In addition, the ALJ found the opinion internally inconsistent. *Id.* "In the questionnaire, Dr. McMillan opined that Ms. Newbold could not prepare and eat a simple meal or carry out routine ambulatory activities such as shopping or banking." *Id.* "But in a separate medical record from the same date, he indicated that Ms. Newbold is able to take care of herself and perform her activities of daily living." *Id.* (internal quotation marks omitted).

The Tenth Circuit also affirmed the ALJ's rejection of the claimant's subjective symptom evidence, *id.* at 1267-68, although the court did not specifically discuss the relationship between that evidence and the claimant's impairment of fibromyalgia. The ALJ in that case discounted the subjective symptom evidence because the claimant "has had no persistent neural deficits, she has required no narcotic pain medication for her body aches, she has used only over-the-counter pain medication for her severe migraine headaches, she has experienced no medication side effects, she has required no hospitalizations, she has undergone no physical therapy, she uses no assistive devices to ambulate and she has undergone no mental health treatment." *Id.* at 1267 (alterations omitted). "The ALJ also noted that, on two separate occasions since November 2007,

24

Ms. Newbold had expressed an interest in returning to work and school. Moreover, as the ALJ reasonably pointed out, for fourteen months, from April 2007 until June 2008, Ms. Newbold did not receive treatment from Dr. McMillan, the physician primarily responsible for managing her fibromyalgia." *Id.* at 1267-68 (citation omitted). This was sufficient to affirm. *Id.*

As Ms. Hamadi argues, however, unpublished decisions on the topic have suggested that an ALJ may not analyze an impairment of fibromyalgia solely with reference to whether there is objective medical evidence in the record. In *Gilbert v. Astrue*, the Tenth Circuit reversed an ALJ's rejection of a treating physician's opinion about the functional limitations resulting from fibromyalgia when that rejection was based on a lack of objective evidence and the ALJ had failed to address the non-objective evidence that supported the treating opinion. 231 F. App'x 778, 783-84 (10th Cir. 2007). The court also reversed the ALJ's credibility determination because the claimant's testimony was consistent with her doctor's opinions, and because "the ALJ's assessment of Dr. Kassan's opinions and Ms. Gilbert's credibility were substantially intertwined." *Id.* at 784-85. And in *Moore v. Barnhart*, the Tenth Circuit observed that "fibromyalgia is diagnosed entirely on the basis of patient's reports and other symptoms." 114 F. App'x 983, 991 (internal quotation marks omitted). The ALJ in that case erred when rejecting a treating physician opinion about the claimant's fibromyalgia, because the ALJ "focused his disbelief of plaintiff's pain claims on the lack of 'clinical signs' [and] . . . fibromyalgia is a condition that is simply not amenable to such clinical determination." *Id.* at 995.

The Court does not find these analyses particularly persuasive, in light of the published opinion in *Newbold v. Colvin* as well as numerous unpublished cases holding that an ALJ may reject a treating physician's opinion about the functional limitations resulting from fibromyalgia based on objective evidence, such as physical examinations and the claimant's activities of daily

living. For example, in *Tarpley v. Colvin*, the ALJ permissibly rejected the treating physicians' opinions where the plaintiff had full range of motion in her joints, had normal strength, walked and moved without much difficulty, had been able to care for her personal needs, did household chores, went shopping, found relief with medication, and on her doctors' recommendations, stayed active with friends and family. 601 F. App'x 641, 643 (10th Cir. 2015). *Romero v. Colvin* applied these principles to the ALJ's evaluation of subjective symptom evidence. 563 F. App'x 618 (10th Cir. 2014). It explained that, "to the extent that the ALJ discounted Ms. Romero's fibromyalgia because of benign medical test results, she appears to have erred," but found that it was permissible for the ALJ to rely on the plaintiff's daily activities and her statements that she experienced relief from medication and exercise as prescribed by her doctor. *Id.* at 621-22.

And in *Trujillo v. Commissioner, SSA*, the Tenth Circuit found that it was proper for an ALJ to find a severe impairment of fibromyalgia and nonetheless find the claimant not disabled on the basis of objective medical evidence. 818 F. App'x 835, 843-44 (10th Cir. 2020). An ALJ may credit a diagnosis of fibromyalgia but must still ensure there is sufficient objective evidence to support a finding that the impairment "so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." *Id.* at 844 (quoting SSR 12-2p, 2012 WL 3104869, at *2). The ALJ may consider the claimant's longitudinal record in assessing the existence, severity, and disabling effects of fibromyalgia. *Id.* The court "therefore reject[ed] Trujillo's perfunctory assertion that it was 'improper' for the ALJ to rely on objective medical evidence in the longitudinal record." *Id.*

The Court finds, first and foremost, that the ALJ in this case did not err by adopting the only medical opinion evidence in the record—the opinion of the state agency consultants that Ms. Hamadi, despite her impairment of fibromyalgia, can perform light work. AR 21, 66, 72-73.

In addition, the Court finds that the ALJ permissibly relied on physical examinations as well as Ms. Hamadi's activities of daily living. She cooks complete meals, performs household chores, drives, shops in stores for groceries once a week for about an hour, and provides extensive care for her children.[9]

Nor does Ms. Hamadi dispute that one of her treatment providers stated "[t]here was inconsistency between what the patient reported and what was observed as the patient states she was unable to walk, but was observed to walk a number of times. By my physical exam, the patient did have weakness, but there was evidence of very poor effort on the patient's part. Per PT evaluation, they also documented inconsistent demonstrations on the part of the patient. . . . On the day of discharge, the patient reported that her strength had improved despite no specific intervention on her part." AR 385; *see also* AR 377 (referencing "feelings of weakness" that are "possible somatic in nature given physical exam findings (Hoover sign suggestive of poor effort)").

Ms. Hamadi argues that this one episode is "overwhelmed" by the objective evidence of her pain and resulting limitations. As outlined above with respect to each specific impairment Ms. Hamadi focuses on in this appeal, however, the Court disagrees. And it was not error for the ALJ to cite this observation in the course of his evaluation of subjective symptom evidence. The Court finds that the ALJ's reasons for partially discounting Ms. Hamadi's allegations of pain are

---

[9] Ms. Hamadi argues she only has two children living at home, not the "several" children referenced by the ALJ. Doc. 28 at 21. The ALJ's finding that childcare is a substantial activity, undermining her symptom allegations, would be supported by substantial evidence even if she were only taking care of one child. Childcare of any amount is not the kind of "insubstantial" activity such as television watching the Tenth Circuit has said is an impermissible factor for the ALJ's consideration.

sufficiently linked to substantial evidence. *Cf. Huston*, 838 F.2d at 1133; *Newbold*, 718 F.3d at 1265-66; SSR 16-3p, 2016 WL 1119029, at *2.

## V.     The ALJ Did Not Err In Finding That Ms. Hamadi Had No Medically Determinable Mental Impairments.

At step two, the ALJ must "consider the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4); *id.* § 416.920(a)(4). Step two is "based on medical factors alone." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). "An impairment giving rise to disability benefits is defined as one which 'results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.'" *Williamson v. Barnhart*, 350 F.3d 1097, 1099-100 (10th Cir. 2003) (quoting 42 U.S.C. § 423(d)(3)). At step two in this case, the ALJ found:

> No mental impairment has been established by objective medical evidence, and accordingly the claimant has no medically determinable mental impairments. Great weight was therefore given to the statements of the State psychological consultants to this effect. (Exs. 3A; 4A; 7A; 8A.)

AR 18.

Ms. Hamadi argues that this was error because there is record evidence relating to her anxiety and depression that rises to the level of a medically determinable mental impairment. Doc. 28 at 22-23. The Court disagrees. Ms. Hamadi relies on a self-reported use of amitriptyline for "depression," AR 272; a physical therapist's observation, during her five-day hospital stay in August 2016, that she presented as "anxious, sad, tearful," AR 387; and a nurse's note during the same hospitalization that she had anxiety about her respiratory symptoms, AR 382. *See* Doc. 28 at 22-23.[10] That is, Ms. Hamadi cites no evidence from "medically acceptable clinical and

---

[10] Ms. Hamadi also cites AR 914-16 as documenting her "anxiety" and "stress." Doc. 28 at 22-23. Neither word appears on these pages, which describe an ER visit for "flank pain." Even if

laboratory diagnostic techniques." *Williamson*, 350 F.3d at 1099. Furthermore, it is not evidence

of a "psychological abnormality," *cf. id.*, to observe, during a hospitalization, that a person

presents as anxious. The Court notes that the ALJ gave great weight to the State agency medical

consultants who found no medically determinable mental impairments, AR 67-68, 99-100, and

finds that Ms. Hamadi's cited record evidence does not contradict these opinions. The Court

affirms the ALJ's step-two determination of Ms. Hamadi's mental impairments.

## VI.     The ALJ Did Not Err Regarding The Work Ms. Hamadi Can Perform.

At step four, the ALJ found that Ms. Hamadi could return to her past relevant work "as a

sales clerk." AR 21. The ALJ explained:

> Within the past 15 years, the claimant has worked as a sales clerk, Dictionary of
> Occupational Titles (DOT) #299.677-010, which is light work with a specific
> vocational preparation (SVP) rating of 2. The claimant performed this occupation,
> at earnings sufficiently high to qualify such performance as substantial gainful
> activity, long enough to have learned it given its SVP. Accordingly, the claimant
> has past relevant work as a sales clerk. (Exs. 8D; 1E; 3E; 4E; 14E; Hearing
> Testimony.)
>
> Based on the testimony of the vocational expert, I find that the claimant is able to
> perform her past relevant work as a sales clerk, both as actually and as generally
> performed.

AR 22.

Ms. Hamadi argues that the VE testified, and the ALJ found, that Ms. Hamadi could

perform the occupation of sales clerk insofar as it requires six hours of sitting, standing, or

walking per workday. Doc. 28 at 24. The definition of "light work" is that it "requires standing

or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10,

---

this evidence were as she described it, however, the Court would find it not objective medical
evidence of a mental impairment for the same reasons described above.

1983 WL 31251, at *6. Plaintiff argues this is inconsistent with her own report that her past work required her to stand "all day." Doc. 28 at 24 (citing AR 253).

The Court rejects this contention. Plaintiff's evidence regarding how she actually performed the job is not dispositive because the ALJ also found that she can perform the job of sales clerk "as generally performed." AR 22. In *Andrade v. Secretary of Health & Human Services*, whether a claimant can do past relevant work as actually performed is only part of the analysis. 985 F.2d 1045 (10th Cir. 1993). Even if the claimant cannot return to the work actually performed, the claimant is not disabled if he or she can perform past relevant work as it is generally performed in the national economy. *Andrade*, 985 F.2d at 1050 (recognizing that under 20 C.F.R. § 404.1560(b)(2); SSR 82-61, 1982 WL 31387, at *1-2, the Agency "defines past relevant work as the claimant's ability to perform *either* 1. the actual functional demands and job duties of a particular past relevant job; *or* 2. the functional demands and job duties of the occupation as generally required by employers throughout the national economy.") (internal quotation marks and alterations omitted, emphasis added). "Therefore, claimant bears the burden of proving his inability to return to his particular former job *and* to his former occupation as that occupation is generally performed throughout the national economy." *Id.* (emphasis added). Ms. Hamadi does not address why she cannot return to the job of sales clerk as it is generally performed in the national economy. The ALJ assigned her an RFC for light work, and the job of sales clerk as generally performed is light work.

Plaintiff relies heavily on *Kimes v. Commissioner, SSA*, where the Tenth Circuit reversed because "the ALJ made no inquiry as to how much sitting the job of tractor-trailer truck driver requires, as it is performed generally." 817 F. App'x 654, 658 (10th Cir. 2020). This case is not on point because here, the ALJ made a finding that the job of sales clerk is "light work with a

specific vocational preparation (SVP) rating of 2." AR 22. As discussed above, light work means standing and walking for up to six hours. This finding is all that is required under the case law. *Cf. Wells v. Colvin*, 727 F.3d 1061, 1075 (10th Cir. 2013) (ALJ made a "sufficient finding concerning this issue when he stated that the claimant's past work of bookkeeper was sedentary in exertional level" (alterations and internal quotation marks omitted)).

Finally, the Commissioner argues that the step four finding of past relevant work is harmless error, if any, because the ALJ proceeded to step five. Doc. 32 at 24; *see Jones v. Berryhill*, 720 F. App'x 457, 459 (10th Cir. 2017) ("any error in the ALJ's step-four finding was harmless given the ALJ's alternative finding at step five that Jones could work as a dishwasher"). The Court finds no step four error, but even if Plaintiff were correct, the Court would affirm at step five. Plaintiff's only step-five argument of error is that the ALJ erred when he did not find that Plaintiff can "never" be exposed to pulmonary irritants. Doc. 28 at 25-26. As discussed above, the Court found no error in the RFC relating to pulmonary irritants. The Court therefore finds no step-five error on the same basis. The decision below is affirmed.

## CONCLUSION

For the reasons stated above, Ms. Hamadi's Motion To Reverse And Remand For Rehearing, With Supporting Memorandum, Doc. 28, is **DENIED**.

**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by Consent**